## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOHN DRAPE,               )
                              )
          **Plaintiff,**       )
                              )      **CIVIL ACTION**
**v.**                             )
                              )      **No. 12-2172-KHV**
**UPS, INC.,**             )
                              )
          **Defendant.**      )
_____)

## MEMORANDUM AND ORDER

John Drape brings suit pro se against UPS, Inc. for age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. This matter is before the Court on Defendant United Parcel Service, Inc.'s Motion For Summary Judgment (Doc. #68) filed March 26, 2013. For reasons stated below, the Court sustains the motion in part.

## I.     Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d

1279, 1283 (10th Cir. 2010). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry his burden, the nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283. Although the Court holds pro se filings to a less stringent standard than formal pleadings drafted by lawyers, it does not assume the role of advocate for a pro se litigant; he must follow the same rules that govern all other litigants. See Ogden v. San Juan Cnty., 32 F.3d 452, 455 (10th Cir. 1994); Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

**II.    Facts**

The following facts are either uncontroverted, deemed admitted or construed in the light

most favorable to plaintiff, the nonmovant.[1]

UPS is a package delivery company which has an interest in processing packages as efficiently and quickly as possible. It has a Professional Conduct and Anti-Harassment Policy which expressly prohibits discrimination, harassment and retaliation.

At UPS, loaders take packages off of conveyor belts and load them onto trailers designated for certain destinations. The different belts are identified by color. For example, packages on the red belt are designated for locations in Iowa and Kansas, while packages on the pink belt are designated for the Kansas City metropolitan area. Each loader performs the same function –

---

[1]    The Court recites only those facts that are material to defendant's motion and disregards any facts which are not supported by citations to the record. Pursuant to D. Kan. Rule 56.1, "material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D. Kan. R. 56.1(a); see also id. 56.1(b). Here, plaintiff has not controverted defendant's statement of facts but instead has listed an independent "Statement Of Facts" without referencing defendant's facts. See Plaintiff John Drape's Response In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Response") (Doc. #78) filed June 17, 2013 at 3-14. Because plaintiff proceeds pro se, the Court considers the record as a whole and construes the facts in the light most favorable to plaintiff.

In response to defendant's motion for summary judgment, plaintiff relies in part on exhibits which are not sworn or verified. For example, Exhibit 4 contains an unsigned, undated handwritten letter which purports to be from plaintiff to UPS Employee Relations Director Brad Williams concerning a threat by plaintiff's manager Gary Watkins. In a cover page to the exhibit, plaintiff states that the handwritten document is a draft of the letter which he mailed to Williams on or about August 6, 2009. See Exhibit 4. Although plaintiff has not verified his statements in the cover page, it appears that he could easily do so. The same is true of Plaintiff's Exhibit 12 titled "Robbie Rash Audit," Plaintiff's Exhibit 23 titled "Plaintiff's Check Stubs," Plaintiff's Exhibit 24 titled "Red And Pink Belts Loader Comparison" and many others.

Under D. Kan. Rule 56.1(d), "[a]ll facts on which a motion or opposition is based must be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories, and responses to requests for admissions." Under Rule 56(e) of the Federal Rules of Civil Procedure, if a party fails to properly support an assertion of fact, the Court may, inter alia, give the party "an opportunity to properly support or address the fact" or "issue any other appropriate order." Fed. R. Civ. P. 56(e). Here, the unverified facts do not materially affect the Court's outcome, so the Court need not decide whether to give plaintiff an opportunity to properly support his exhibits.

loading packages – regardless of the belt on which he works.

Loading requires physical labor, including lifting, bending, climbing ladders, picking up packages, removing and stacking packages from carts, and walking repeatedly back and forth in trailers. Loaders report to part-time supervisors, full-time supervisors, and ultimately to the business manager. Full-time supervisors also report to the business manager. Part-time supervisors generally do not have authority to hire, fire, suspend or move employees. The business manager and/or full-time supervisor are responsible for ultimate employment decisions.

From August of 2008 through September of 2011, Mark Bowen was the business manager over the day sort in Lenexa. His duties included overseeing loaders and making personnel and disciplinary decisions.

In August of 1998, UPS hired plaintiff as a part-time loader in its facility in Lenexa, Kansas. At the time, he was 44 years old. Plaintiff worked on the red belt until December 6, 2010, when Bowen moved him to the pink belt. Plaintiff continues to work for UPS, and he likes working there. Plaintiff is a union member represented by Local 41. As such, plaintiff is entitled to file grievances and be represented by the union.

### A. Summer of 2009 – Plaintiff "Locked In" To Load Most Difficult Trailer And Counseled For Harassing His Supervisors

In July of 2009, Rebecca Aciego became full-time supervisor over the red belt. As noted, almost a year earlier, in August of 2008, Bowen became business manager over the day sort, which included the red belt. When management over the red belt changed, plaintiff observed that management was trying to get more work out of everyone, regardless of age.

Bowen, Aciego and other supervisors generally expected loaders at the Lenexa facility to

load 300 packages per hour ("PPH").[2] Aciego set goal of 300 PPH for her loaders. Supervisors discussed PPH with each of their loaders every day. Although the goal for all loaders was 300 PPH, UPS generally did not discipline loaders for not reaching the goal because it assumed that loaders would work to their full potential.

Prior to the summer of 2009, plaintiff had worked at UPS for 10 years and no one had complained about his PPH. Within a month after Aciego arrived on the red belt, she observed that plaintiff exhibited inappropriate and combative behavior toward herself and Breanne Knaebel, the part-time supervisor on the red belt.[3] Knaebel treated people erratically and plaintiff had a difficult relationship with her.[4] Knaebel put plaintiff in particular trailers based on PPH, i.e. the number of packages that he loaded per hour. Plaintiff's Depo. at 96:8-97:7. On several occasions, Knaebel told plaintiff that she would let him work in more desirable trailers if he reached over 300 PPH. Id. at 96:11-13. Plaintiff contends that at times, he did reach over 300 PPH. Id. at 97:3-6.

Bowen and Aciego punished plaintiff by putting him in the hardest trailer to load, i.e. the Garden City trailer. Affidavit of Rodney Taylor (Doc. #78-8) ¶ 25, Exhibit 7 to Plaintiff's Response (Doc. #78). They gave him less help than others who worked in this trailer. Id. Normally, loaders received help while loading the Garden City trailer but plaintiff did not. Id. ¶ 28. The Garden City trailer is the hardest trailer to load; the loader has to stack his boxes on the floor until the next trailer

---

[2] The general job description for loaders states that they should load 500 to 1200 packages per hour, but the essential functions of the job vary greatly depending on the size and location of the UPS facility.

[3] The record does not reflect when Knaebel became part-time supervisor over the red belt.

[4] Plaintiff contends that Bowen stated that UPS was "counseling" Knaebel. Plaintiff's Depo. at 94:23-95:1.

arrives, but while he is stacking he does not get PPH credit.  Id. ¶ 29.

On August 5, 2009, plaintiff was "locked" in the Garden City trailer.[5]  Plaintiff complained and asked to be moved to a different trailer.  He then left his trailer and instead of loading, yelled at Aciego and Knaebel.  Aciego complained to management that plaintiff had harassed her and Knaebel.

The next day, on August 6, 2009, Employee Relations Manager Brad Williams, Labor Manager Don Lewick, Manager Gary Watkins and Aciego met with plaintiff for an informal review.  They reviewed the UPS anti-discrimination/harassment policy and plaintiff signed the policy.  At the meeting, plaintiff complained that Knaebel locked him into trailers without help and micro-managed him.  Plaintiff's Depo. at 94:4-9, Exhibit 2 to Plaintiff's Response (Doc. #78).  Watkins called plaintiff difficult, obstinate and intimidating and said that if he were in charge, he would fire plaintiff on the spot.  Id. at 92:5-21.  Following the meeting, plaintiff wrote a letter to Williams which complained about Watkins' conduct at the meeting.  Id. at 95:14-21.

### B.    Fall Of 2009 – Plaintiff Fired For Refusing To Stretch And Reinstated

On October 15, 2009, Bowen directed supervisors to lead over 300 employees in stretching.[6]  As a result, Knaebel encouraged employees on the red belt to stretch.  Plaintiff's Depo. at 100:23-25.  The employees participating in the stretching activity were down on the floor and had not yet clocked in.  Id. at 101:4-11.  Plaintiff was on the clock and in a trailer working.  Id. at 100:9-11, 101:4-11.  Knaebel told plaintiff to stop what he was doing and stretch.  Id. at 100:9-11.  Plaintiff

---

[5]    Plaintiff was not physically locked in the trailer, but was assigned to the trailer and not allowed to transfer to another trailer until he increased his PPH.  Plaintiff's Depo. at 254:2-11.

[6]    Although physical stretching is not a job requirement, UPS supervisors encourage employees to stretch and they sometimes lead employees in stretching to prevent injury.

replied that he had already started work and that he was not going to stretch. Id. at 100:15-16. Plaintiff stated that he felt like it was an intrusive personal thing and that she was jerking him around.[7] Id. at 100:17-19. When plaintiff refused to stretch, Knaebel contacted Aciego and Bowen.

When Aciego and Bowen arrived, Aciego asked plaintiff if he had refused to stretch. Plaintiff replied: "Yes I refused to stretch, and if [Knaebel] wanted to, she could also instruct me to bark like a dog and I wouldn't do that either." Bowen then asked plaintiff if he refused to follow instructions. Plaintiff answered, "Yes I did." Bowen explained that plaintiff could only refuse to follow instructions if they were illegal, immoral or unethical. Plaintiff responded that Knaebel's instruction was unethical and harassing. Bowen disagreed and asked plaintiff whether he would participate in stretching or not. Plaintiff responded that he would not follow the instruction. Bowen then terminated plaintiff for refusing to follow instructions. Bowen ultimately reduced the termination to a suspension.

On October 16, 2009, plaintiff wrote a letter to Williams which stated in part as follows:

[T]he actions of other full time managers make me question whether there is pressure to remove me from the red belt. A half dozen times in the last month I have been asked to sign up for openings in the small sort. These invitations have come from Rebecca, Dave O'Bryan, and Tyler Dawson. The context of these invitations has been friendly but also linked to the difficulty I continue to have with Breanne [Knaebel].

Letter to Williams (undated, unsigned and unauthenticated), Exhibit 6 to Plaintiff's Response (Doc. #78).[8]

_____

[7]    In an unsworn grievance statement, plaintiff stated that he told Knaebel that he had already stretched. See Exhibit 5 to Plaintiff's Response (Doc. #78). In his deposition, plaintiff could not recall whether he had stretched that day. Plaintiff's Depo. at 104:6-8.

[8]    In a cover page to Exhibit 6, plaintiff states that on or about October 16, 2009, he sent
(continued...)

Plaintiff filed a grievance regarding the suspension. When he arrived for the hearing, Bowen gave him an option of having a hearing or returning to work on the red belt and Bowen would transfer Knaebel to the orange belt. Plaintiff's Depo. at 106:15-107:1. Plaintiff chose to return to work on the red belt.

### C.     January 2010 – Age-Related Remarks By Andre Strange

On January 22, 2010, part-time supervisor Andre Strange told plaintiff that the red belt was for younger guys and that plaintiff was 60 years old and his PPH would never go above 250.[9] Exhibit 10 to Plaintiff's Response (Doc. #78).[10]  Plaintiff complained to Bowen, who counseled Strange in front of plaintiff.  Bowen told Strange that if said, age-related comments were inappropriate and UPS would not tolerate any form of discrimination.  After that discussion, Bowen did not receive any complaints from any employee regarding Strange making age-related comments.

### D.     September 2010 – PPH Quota

In early September of 2010, plaintiff's supervisors were concerned that he was hostile to the PPH goal, resisted working to his full potential and encouraged other workers to do the same.

On September 3, 2010, red belt supervisor Kyle McTaggart moved plaintiff from a loading job to a pickoff position.  McTaggart told plaintiff that Aciego said that he was loading too slowly.

On September 9, 2010, Aciego discussed plaintiff's PPH with him, as she did with all loaders

---

[8](...continued)
the letter to Williams.  Although plaintiff has not verified these facts, it appears that he could easily do so.  In the end, however, they are not material to the Court's ruling herein.

[9]      The record is unclear whether Strange supervised plaintiff.

[10]      The cover page to Exhibit 10 states that plaintiff wrote down remarks which Strange told him.  It states that Strange said, "Iowa for the younger guys, that's what the red belt is about," and "You're sixty and pph never go above 250."  Exhibit 10 to Plaintiff's Response (Doc. #78). Plaintiff's remarks are not sworn, but they are not material to the Court's ruling herein.

that she supervised on the red belt that day. Aciego told plaintiff that his PPH was too low and that his performance had worsened. At some point, she encouraged plaintiff to transfer to the small sort where packages are lighter, or to become a full-time pickoff. Plaintiff had been working as a pickoff since July 1 and had only recently returned to loading. He asked Aciego to which PPH numbers she was referring because he had not been loading for three months. Plaintiff complained that Aciego had singled him out. Plaintiff was not the only loader whose PPH was under 300. Aciego asked if she could help plaintiff meet the 300 PPH goal. Plaintiff responded that he did not have to maintain a certain PPH goal and told Aciego to "substantiate" the 300 PPH goal or "shut up." Aciego complained to Bowen that plaintiff was combative when she discussed his PPH with him.

On September 14, 2010, plaintiff filed a grievance regarding Aciego's criticism of his productivity. Plaintiff's Depo. at 110:20-23. Plaintiff stated that Aciego continued to single him out and criticize his performance without substantiation, and that "[h]er actions cross the boundary of concern for productivity and continue a pattern of harassment and discrimination." September 14, 2010 Grievance, Exhibit 11 to <u>Defendant UPS's Memorandum In Support Of Its Motion For Summary Judgment</u> (Doc. #69). Regarding the incident on September 3, plaintiff stated that McTaggart told him that Aciego stated that plaintiff was too slow and instructed that he be moved from loader to pickoff. Plaintiff referred to an accusation by Aciego that he was "old and slow" and said that it had previously been addressed with the former red belt supervisor, Strange, and that at that time Bowan had told Strange and Aciego that as long as plaintiff worked consistently and followed methods and safety guidelines, the PPH would take care of itself. <u>Id.</u> Plaintiff complained that Aciego nevertheless had continued to berate his performance. <u>Id.</u> He stated that throughout her time as supervisor, Aciego had continually suggested that he transfer from the red belt and that she

suggested that he transfer to smalls[11] and apply for pickoff positions on the blue and white belts. Id.

Plaintiff complained that Aciego had engaged in a continued effort to single him out and that she

used PPH not as a legitimate measurement but as a way to attack him. Id.

Based on Aciego's complaint and plaintiff's statement of September 14, Bowen decided to

conduct an on-job-supervision ("OJS") audit on plaintiff to resolve the conflict.[12] Bowen asked Raul

Sanchez, a part-time supervisor who did not supervise plaintiff, to conduct the audit.

On September 16, 2010, plaintiff came to work and found Sanchez waiting to audit his work.

Taylor Aff. ¶ 12. Sanchez told plaintiff that he was supposed to watch him all day and fill out a

form. Id. In the first five minutes of the evaluation, plaintiff's part-time supervisor, McTaggart, told

plaintiff that he did a "good job" by catching a test package designated for a different trailer.

Plaintiff responded: "Spare me the bullshit, Kyle." Plaintiff said that he wanted to talk with

someone who could explain what was going on. Id. ¶ 14. Shortly thereafter, Bowen arrived and told

plaintiff that he was going to have an OJS audit because Aciego believed that he was too slow.

Id. ¶ 15. Plaintiff lost his temper, raised his voice, pointed his finger at Bowen, used the word

"bullshit" and called Bowen "incompetent" and a "hypocrite." Bowen warned plaintiff to calm

down. When plaintiff refused, Bowen terminated his employment for insubordination, which

---

[11]     The record does not explain what "smalls" is or are.

[12]     Defendant contends that Bowen decided that a "methods evaluation" on plaintiff
would resolve the conflict. A methods evaluation determines whether an employee is conducting
the essential job functions safely and efficiently. UPS conducts such evaluations on all loaders at
least quarterly. These evaluations are not a form of discipline, but a tool to improve efficiency and
determine how to staff particular belts based on each employee's ability.
        Construed in the light most favorable to plaintiff, the record supports an inference that
Bowen decided to do an OJS audit on plaintiff. See Plaintiff's Depo. at 132:19-22; Taylor Aff. ¶
15. Although the record is not clear on this point, it appears that an OJS audit is different from a
methods evaluation and that OJS audits are given much more rarely.

included his use of profanity.

After plaintiff left, Bowen told Rodney Taylor, pickoff on the red belt and union steward, that he (Bowan) could have handled the situation better.[13] Id. ¶ 17. Specifically, Bowen stated as follows: "A guy turns in a grievance and the next day there is someone in his trailer with a clipboard." Id. Bowen told Taylor that Aciego had no right to tell plaintiff that he was too slow. Id. ¶ 18. Bowen asked Taylor how plaintiff could be too slow if they did not have a number for him. Id. ¶ 19. Bowen's solution was to give plaintiff a three-day OJS audit to find a quota number for him. Id. ¶ 20. Taylor knows of no other loader who has received a quota number. Id. ¶ 21.

On September 17, 2010, plaintiff returned to work for an informal meeting with Bowen to discuss his termination. Taylor, Aciego and head union steward Chris Santoyo were also at the meeting. Plaintiff apologized for his conduct and Bowen reduced his termination to a suspension. Bowen explained that a method evaluation on plaintiff would help to resolve the conflict. The union and Bowen agreed to a three-day OJS of plaintiff the following week.[14]

On September 21, 22 and 23, 2010, Aciego and supervisor Jack Baker observed plaintiff for the OJS audit. During the audit, plaintiff averaged 216 packages per hour and on one day he reached an estimated pace of 300 PPH. As a result of the audit, UPS set a quota of 216 PPH as a fair measure of plaintiff's performance. After the OJS audit, plaintiff's supervisors did not counsel him regarding his PPH numbers. From September to December of 2010, plaintiff had no problems with Aciego.

---

[13]     Taylor has worked for UPS since 1988. Since 1997, he has worked as pickoff on the red belt.

[14]     UPS collected daily PPH information on all loaders. The reports were available to loaders and showed their PPH rate per hour. Among loaders, the PPH rates varied each day. At times, plaintiff did meet the 300 PPH rate.

UPS has never audited a loader in the way that it did plaintiff. See Affidavit Of Chris Santoyo ¶ 14, Exhibit 15 to Plaintiff's Response (Doc. #78). Full-time supervisors rarely – if ever – perform OJS audits on part-time loaders. Younger workers on the red belt were not subjected to OJS audits and did not receive suggestions or threats to move to another work area. Daily scan reports show that plaintiff was not the only loader with a PPH under 300. Several loaders under the age of 40 had a PPH under 300.

### E.     December 2010 – Plaintiff Moved To Pink Belt

On Thursday, December 2, 2010, as plaintiff was about to leave work, co-worker Yvette Cohn approached him. Cohn introduced plaintiff to human resources supervisor Bridget George. George was investigating a complaint by Cohn regarding harassment by Aciego. Cohn Aff. ¶¶ 52-53. During the conversation, Aciego stared at and intimidated them and harassed Cohn by telling her to get off the clock even though they were discussing work-related matters. Id. ¶¶ 54-60. Aciego told plaintiff that he had to leave and he did so. Id. ¶ 48.

When plaintiff arrived to work the next day, he sought out Aciego and told her that he thought she was rude in asking him to leave the day before. In a raised tone, plaintiff told Aciego that she was rude, unprofessional and only cared about minutes, production and PPH. Plaintiff then asked to see PPH number for coworkers and himself for the month of November. Plaintiff stated that he wanted the numbers so that he could substantiate that he had met his goal of 216 PPH. Aciego responded that she did not know if she could get the information because they were kept on a weekly basis only. Aciego asked that they finish the conversation in the presence of a union steward. So they repeated the conversation in front of Santoyo.

The confrontation brought Aciego to tears. Aciego went to a bathroom where she broke

down and cried. She thought that plaintiff was hostile, aggressive and tried to intimidate her. Aciego complained to Bowen that plaintiff harassed her and verbally abused her. She complained that plaintiff yelled, was hostile, aggressive and tried to intimidate her. Bowen noticed that Aciego was extremely upset and disturbed by her interaction with plaintiff.

Plaintiff contends that he spoke in a normal tone of voice. See Plaintiff's Depo. at 154:4-7. Santoyo knew that Aciego was not happy with the situation, but he does not think that plaintiff did anything that would have resulted in him being moved off the red belt.

The next business day, December 6, 2010, Bowen called plaintiff and Santoyo to his office. Bowen explained that he was going to move plaintiff from the red belt to the pink belt.[15] Bowen stated that he wanted to diffuse the problem and that it would be best for everybody if plaintiff went to the pink belt because on the pink belt, loaders do not have to scan boxes and no PPH would be involved. Santoyo did not think that plaintiff did anything to warrant moving him off the red belt. The parties dispute whether Aciego was present during the meeting. She had no prior knowledge that Bowen would separate them. In his deposition, plaintiff stated his understanding of the reason for the separation as follows:

> My understanding was that Mark Bowen did not want Rebecca Aciego complaining about me to him. My understanding was that Mark Bowen wanted to separate us, and that's why he did it. . . . What I understood Mark Bowen was saying is that he was going to move me there so Rebecca would stop complaining to him.

Plaintiff's Depo. at 79:21-24; 80:16-19.

Bowen states that he moved plaintiff to the pink belt to prevent conflict and to resolve

---

[15]     In his affidavit, Bowen states that he took into account that plaintiff was terminated and suspended twice before for insubordination and that Knaebel, Strange, McTaggart and Aciego had all complained that plaintiff had a negative attitude and was difficult to work with. Bowen Aff. ¶ 37.

Aciego's complaint that plaintiff had harassed her, and that he did not consider plaintiff's age as a factor in moving him.[16] This was not the first time that Bowen had moved an employee to prevent conflict. In early 2010, he moved an employee in his twenties from the grey belt to the tan belt for the same reason. After Bowen moved plaintiff, he received no further complaints about plaintiff and plaintiff did not complain about his new supervisors.

After plaintiff moved to the pink belt, 13 employees remained on the red belt. The eight who worked as loaders ranged from 19 to 32 years old. Four workers were over the age of 40 and did not load. Three of the older employees worked as pickoffs and one worked as jam breaker, i.e. keeping packages moving on the conveyor for others to load.

On December 9, 2010, plaintiff filed an EEOC charge alleging discrimination which took place between March 1 and December 6, 2010.[17]

### F.    Union Grievances

On December 7, 2010, plaintiff filed a union grievance challenging his move from the red belt to the pink belt. When an employee files a grievance, the grievance is discussed at a local hearing with the employee, representatives of his union and representatives of UPS management. Under the collective bargaining agreement ("CBA"), if a grievance is not resolved at the local hearing, the matter is then heard by a six-person panel comprised of three union members and three members of management. The panel members are drawn from union and management offices in a state other than the state in which the employee works. For instance, in the case of a Kansas

---

[16]    Bowen was 45 years old when he moved plaintiff from the red belt to the pink belt. Plaintiff testified that he did not know if Bowen had any bias toward older workers or if any workers under 40 years old received better treatment than him.

[17]    The record does not contain the contents of plaintiff's EEOC charge.

employee, the panel members would be from Missouri. This panel is called the Mo-Kan Panel.

Although the CBA prohibits discrimination and harassment, plaintiff's grievance did not contend that he was discriminated against or harassed. Instead, he contended that his seniority rights were violated. Because plaintiff's grievance was not resolved at the local hearing, it was presented to the Mo-Kan Panel on March 24, 2011. At the Mo-Kan hearing, plaintiff did not claim discrimination. Instead, he argued that Bowen moved him to the pink belt for telling Aciego that she was rude and requesting PPH information. He also argued that the move resulted in a pay cut. UPS Labor Manager Don Lewick carefully reviewed plaintiff's payroll records before the Mo-Kan hearing. In the five weeks before plaintiff moved to the pink belt, he averaged 23.53 hours per week. In the five weeks after he moved, he averaged 23.80 hours per week.

On January 12, 2011, plaintiff filed a second grievance contesting his move to the pink belt. Again, he did not claim discrimination or retaliation. Instead, he argued that he was moved to the pink belt without any explanation and that he worked less hours on that belt. Because the grievance was not resolved at a local hearing, it was presented to the Mo-Kan Panel on July 14, 2011. Lewick reviewed plaintiff's payroll records before the second Mo-Kan hearing. Although the union contract guarantees that plaintiff can work at least 3.5 hours every work day, he had voluntarily chosen to leave work early at least 10 times in the six months following his move to the pink belt. He also did not come to work at least five more days during the six months after he switched belts. After Lewick presented this evidence, the Mo-Kan Panel denied plaintiff's second grievance.

### G.    Job Location, Responsibilities and Pay

Plaintiff receives less hours on the pink belt than he did on the red belt. Taylor Aff. ¶ 75. Because plaintiff's seniority conflicts with workers who were already assigned to the pink belt, he

-15-

generally starts work 10 minutes later than he did on the red belt. See Plaintiff's Depo. at 32:15-21. Unlike the red belt, the pink belt is smaller with fewer doors and it does not get irregular packages, i.e. packages that are either to large or too heavy to go on the conveyer belts. Taylor Aff. ¶¶ 76-77. The red belt almost always has irregular packages to load at the end of the day. Id. ¶¶ 80-81. Because the pink belt has fewer doors and no irregular packages, plaintiff is usually released from work sooner than he would be on the red belt. See Plaintiff's Depo. at 32:3-8.

Defendant prepared a comparison of plaintiff's hours which showed that from January to June of 2011, he worked an average of two hours less per week on the pink belt than he did during the same period of time the year before on the red belt. See Plaintiff's Exhibit 28.[18] Defendant contends that the decrease in hours resulted from voluntary choices by plaintiff to leave work early and not work on Saturdays. See Reply Fact Appendix ¶ 73. Plaintiff contends that he left work only eight times and that six of those times amounted to a total loss of 12 minutes. See Plaintiff's Response (Doc. #77) at 13, ¶ 17.[19]

While plaintiff was on the red belt, he took a test that qualified him to work as a "pickoff" when needed. Because he was qualified to work as a pickoff on the red belt, plaintiff earned an extra dollar an hour. In general, pickoffs work longer hours than loaders because they start earlier to

---

[18]    Plaintiff has not authenticated or verified Exhibit 28. Plaintiff contends that defendant produced the document in discovery. It is stamped as document number UPS-DRAPE 1639, and defendant does not deny its authenticity. The parties have stipulated that plaintiff's employment records (UPS Drape 1618-1826; 1852-2023, 2040-2043) constitute business records and may be introduced in evidence during trial without further foundation. Pretrial Order (Doc. #58) at 4. Under these circumstances, the Court will consider plaintiff's Exhibit 28.

[19]    Defendant complains that plaintiff has not verified this fact, but it appears that he could easily do so. Defendant provides no information regarding the total amount of time that plaintiff missed by leaving early. In any event, it appears to be a fact question whether the decrease in hours was the result of voluntary choice by plaintiff.

-16-

prepare the work area tools and equipment, and stay later to prepare the work area for the next shift. On the red belt, plaintiff was entitled to work as pickoff when the usual pickoffs were on vacation or had a day off. By plaintiff's calculation, on the red belt he would have had an opportunity to work as pickoff for 19 weeks out of the year.[20]

When plaintiff moved to the pink belt, he did not qualify to work as pickoff because defendant requires an employee to take a pickoff qualification test for each belt. When Bowen moved plaintiff, he could have reduced plaintiff's pay by a dollar an hour since he was not qualified to work as pickoff on the pink belt. Bowen chose not to. Plaintiff estimates that as a result of the lost opportunity to work as pickoff on the red belt, he loses approximately 40 hours of work each year.

Although plaintiff's qualification to work as pickoff did not transfer to the pink belt, based on seniority, he would be entitled to a pickoff position on the pink belt if he applied for the position and passed the qualification test. Pickoff jobs are available only when vacated by a current holder. After plaintiff moved to the pink belt, his first opportunity to bid on a pickoff job was on May 3, 2013.[21] Plaintiff chose not to apply for a pickoff position on the pink belt.

## III.    Analysis

As noted, plaintiff claims age discrimination and retaliation. Defendant seeks summary judgment on both claims. With respect to each claim, defendant asserts that plaintiff cannot establish

---

[20]    Defendant complains that plaintiff has not verified his calculation, but it appears that he could easily do so. Regardless, the exact calculation is not material to the Court's ruling herein.

[21]    Defendant objects that plaintiff provides no evidence to show that this was his first opportunity. Reply Fact Appendix at 17, ¶ 82. Defendant does not assert that opportunities occurred before then.

a prima facie case or pretext.

### A. Age Discrimination

Plaintiff asserts that defendant discriminated in the terms and conditions of his employment on account of his age in violation of the ADEA.[22]  Plaintiff may establish that defendant acted with discriminatory intent either directly through direct or circumstantial evidence, or indirectly through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 824 (1973).  See Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1278-79 (10th Cir. 2010).[23] Here, plaintiff relies on the indirect method of proving discrimination.  Under the McDonnell Douglas burden-shifting framework, plaintiff has the initial burden of establishing a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802; Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008) (quoting Sanchez v. Denver Pub. Sch., 164 F.3d 527, 531 (10th Cir. 1998)).  If plaintiff satisfies his burden, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action.  McDonnell Douglas, 411 U.S. at 802-03; Sanders, 544 F.3d at 1105 (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).  If defendant does so, the burden shifts back to plaintiff to show a genuine issue of material fact whether defendant's stated reason is pretextual, i.e. unworthy of belief.  Sanders, 544 F.3d at 1105.  At all times, the burden of persuasion rests with plaintiff to show that defendant discriminated on an illegal

---

[22]     The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

[23]     In Jones, the Tenth Circuit considered whether the McDonnell Douglas framework applied to ADEA claims after the Supreme Court's decision in Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).  It held that "Gross does not preclude our continued application of McDonnell Douglas to ADEA claims."  Jones, 617 F.3d at 1278.

basis.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Jones, 617 F.3d at 1278.  Ultimately, plaintiff must prove by a preponderance of the evidence that defendant would not have taken the challenged action but for his age.  See Gross, 227 U.S. at 177; Jones, 617 F.3d at 1277.

Defendant asserts that plaintiff cannot establish a prima facie case of age discrimination.  To establish a prima facie, plaintiff must show that (1) he is a member of the class protected by the ADEA; (2) he suffered an adverse employment action; and (3) defendant treated him differently than similarly-situated employees for the same or similar conduct.  See MacKenzie v. City & Cnty. of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005).  Defendant asserts that plaintiff cannot meet the second and third elements, i.e. that he suffered an adverse employment action and that defendant treated him differently than similarly-situated employees.

Construed broadly, plaintiff asserts that the following events constituted adverse employment actions for purposes of his age discrimination claim: (1) the termination and reinstatement of his employment in October 2009 for insubordination, i.e. refusing to stretch; (2) the termination/suspension of his employment on September 16, 2010 for insubordination, including the use of profanity; (3) the three-day OJS audit in September of 2010; and (4) his transfer to the pink belt in December of 2010.  See Plaintiff's Response (Doc. #78) at 18.  The Tenth Circuit liberally defines the phrase "adverse employment action."  Jones, 617 F.3d at 1279 (quoting Sanchez, 164 F.3d at 532).  Such actions are not limited to monetary losses in the form of wages or benefits.  Sanchez, 164 F.3d at 532.  Instead, the Court takes a case-by-case approach and examines the unique factors relevant to the circumstances at hand.  Id.  An employment action is adverse if it constitutes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in benefits." Hillig v. Rumsfeld, 381 F.3d 1028, 1032-33 (10th Cir. 2004) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). A mere inconvenience or alteration of job responsibilities does not constitute an adverse action. Sanchez, 164 F.3d at 532.

Regarding the termination of plaintiff's employment in October of 2009, the undisputed facts show that Bowen reduced the termination to a suspension and then allowed plaintiff to return to work on the red belt. Plaintiff points to no monetary loss or significant change in employment status as a result of the action. Thus, plaintiff has not shown a genuine issue of material fact as to whether the action constitutes an adverse employment action. On this record, defendant is entitled to summary judgment on any claim of age discrimination based on the termination of plaintiff's employment in October of 2009.

Regarding the termination of plaintiff's employment on September 16, 2010, the undisputed facts show that Bowen reduced the termination to a suspension and that plaintiff returned to work on the red belt the following week. Plaintiff points to no monetary loss or significant change in employment status as a result of the action. Thus, plaintiff has not shown a genuine issue of material fact as to whether the action constitutes an adverse employment action. On this record, defendant is entitled to summary judgment on any claim of age discrimination based on the termination of plaintiff's employment on September 16, 2010.

Regarding the three-day OJS audit in September of 2010, the undisputed facts establish that after the audit, plaintiff remained on the red belt without incident for several months. Plaintiff points to no monetary loss or significant change in employment status as a result of the OJS audit. Thus, plaintiff has not shown a genuine issue of material fact as to whether the action constitutes an adverse

-20-

employment action. On this record, defendant is entitled to summary judgment on any claim of age discrimination based on the OJS audit in September of 2010.

Regarding plaintiff's transfer from the red belt to the pink belt in December of 2010, defendant asserts that the action was not adverse because it did not significantly change plaintiff's working conditions, responsibilities, pay or benefits. See Defendants' Memorandum (Doc. #69) at 26. Construed in the light most favorable to plaintiff, however, the record supports an inference that on the pink belt, plaintiff had less opportunity to work overtime and that as a result of the transfer, he lost the ability to work as a pickoff. Defendant asserts that plaintiff chose to work fewer hours and that he could have applied for a pickoff position on the pink belt but chose not to. These are questions for the fact finder. On this record, plaintiff has shown a genuine issue of material fact as to whether his transfer from the red belt to the pink belt constituted adverse employment action.

Defendant asserts that even if the transfer did constitute adverse employment action, plaintiff cannot show the third element of a prima facie case, i.e. that defendant treated him differently than similarly-situated employees for the same or similar conduct. Defendant asserts that in early 2010, Bowen moved an employee in his twenties from the grey belt to the tan belt to prevent conflict. See Defendant's Memorandum (Doc. #69) at 26. The record, however, contains no facts regarding the circumstances of that employee and his or her transfer to another belt.[24] Here, plaintiff has produced affidavits from co-workers which suggest that defendant treated him differently for the same or similar conduct. One co-worker, Yvette Cohn, a 28-year-old loader on the red belt, states that she

---

[24] Defendant also points to plaintiff's deposition testimony that he does not know whether younger workers were treated better or whether Bowen had any bias toward older workers. See Defendant's Memorandum (Doc. #69) at 26-27. This testimony does not establish that defendant did not treat plaintiff differently for the same or similar conduct.

felt harassed by Aciego and made complaints to supervisors, managers and union stewards about the harassment, and she was never threatened with a transfer to another work area. See Affidavit Of Yvette Cohn, Exhibit 14 to Plaintiff's Response (Doc. #78); see also Affidavit Of Eli Waterman ¶ 10, Exhibit 8 to Plaintiff's Response (Doc. #78) (27-year-old loader on red belt made complaints about harassment but was not threatened with transfer to another work area); Affidavit Of Eric Cisneros ¶ 6, Exhibit 17 to Plaintiff's Response (Doc. #78). Moreover, union steward Santoyo, who was present during the confrontation between plaintiff and Aciego, does not think that plaintiff did anything that would have resulted in him being moved off the red belt. See Santoyo Affidavit ¶¶ 4-5 and personal statement attached thereto. On this record, a genuine issue of material fact exists as to whether defendant treated plaintiff differently than similarly-situated employees for the same or similar conduct. Defendant is not entitled to summary judgment on grounds that plaintiff cannot establish a prima facie case of age discrimination regarding his transfer to the pink belt.

Defendant states that it transferred plaintiff to separate him from Aciego because Aciego complained that he had harassed her. See Defendant's Memorandum (Doc. #69) at 27. Because defendant has produced evidence to support a nondiscriminatory explanation for its decision, the burden shifts back to plaintiff to show that the legitimate reason offered by defendant is not the true reason, but a pretext for discrimination. See Reeves, 530 U.S. at 143. In other words, plaintiff may attempt to establish that he was the victim of discrimination by showing that defendant's proffered explanation is "unworthy of credence." Id. (quoting Tex. Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)); see also Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005). At this point, although the presumption of discrimination drops out of the picture, the trier of fact may still consider the evidence establishing plaintiff's prima facie case – and inferences

properly drawn therefrom – in determining whether defendant's explanation is pretextual.

Defendant asserts that plaintiff cannot show that its explanation for the transfer is pretextual. Specifically, defendant asserts that plaintiff admits that Aciego complained that he harassed her and that management had an obligation to address complaints regarding harassment. See Defendant's Memorandum (Doc. #69) at 27. These "admissions," however, do not establish that defendant's explanation for the transfer is not pretextual. On the contrary, plaintiff presents evidence which construed in his favor suggests that defendant's stated reason for the transfer is false. Although Aciego was upset by the confrontation on December 4, plaintiff spoke in a normal tone of voice and Santoyo, a union steward who witnessed the conversation, does not think that plaintiff did anything that would have resulted in a transfer off the red belt. Although younger workers also loaded under 300 PPH, plaintiff's supervisors singled him out regarding productivity. On September 14, plaintiff complained that Aciego had engaged in a pattern of harassment and discrimination and had referred to him as "old and slow." Thereafter, Bowen subjected plaintiff to an unprecedented three-day OJS audit to establish a PPH quota for him, when no other loader has been given a PPH quota. When Bowen decided to move plaintiff, he stated that it would be best for everybody because on the pink belt, loaders do not have to scan boxes and no PPH numbers would be involved. Finally, after plaintiff moved to the pink belt, the loaders who remained on the red belt ranged in age from 19 to 32 years old and the four workers who were over the age of 40 did not load. On this record, a reasonable inference could be drawn that defendant's stated reason for the transfer is false and that the true reason for the transfer was age discrimination. See, e.g., Reeves, 530 U.S. at 146-49. Defendant is not entitled to summary judgment on plaintiff's claim that it discriminated on the basis of age by transferring him to the pink belt.

### B.     Retaliation

Plaintiff claims that defendant retaliated against him because he complained of age discrimination.  The ADEA prohibits an employer from discriminating against an employee for opposing any practice made unlawful by the Act.[25]  See Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1201-02 (10th Cir. 2008).  The McDonnell Douglas framework also applies to plaintiff's retaliation claim.  See Lujan v. Walters, 813 F.2d 1051, 1058 (10th Cir. 1987).  To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) he suffered materially adverse action; and (3) a causal connection existed between the protected activity and the materially adverse action.  Hinds, 523 F.3d at 1202.  Defendant contends that plaintiff cannot establish any elements of a prima facie case.

Defendant asserts that plaintiff cannot establish the first element of a prima facie case, i.e. that he engaged in protected opposition to discrimination.  This element requires plaintiff to show that he opposed a perceived violation of the ADEA, such as employer discrimination.  See, e.g., Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006).  Protected opposition to discrimination can range from filing formal charges to voicing informal complaints to superiors.  Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004).  To demonstrate protected opposition to discrimination, plaintiff must show that he had a reasonable good-faith belief that the opposed behavior was discriminatory.  Id. at 1016; see Bd. of Cnty. Comm'rs, Freemont Cnty., Colo. v. E.E.O.C., 405 F.3d 840, 852 (10th Cir. 2005).  This standard has subjective and objective

---

[25]     The ADEA states in part as follows: "It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section."  29 U.S.C. § 623(d).

components, Little v. United Tech., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997), and empowers an employee to report what he reasonably believes is discriminatory conduct without fear of reprisal. Bd. of Cnty. Comm'rs, 405 F.3d at 852. The complaint of discrimination may constitute protected opposition even if it is mistaken, so long as the belief that discrimination occurred was objectively reasonable and made in good faith. See Love v. RE/MAX of Am., Inc., 738 F.2d 383, 385 (10th Cir. 1984).

On September 14, 2010, plaintiff filed a grievance regarding Aciego criticizing his productivity. In the grievance, plaintiff complained that Aciego's actions "cross the boundary of concern for productivity and continue a pattern of harassment and discrimination." Exhibit 11 to Defendant's Memorandum (Doc. #69). Plaintiff stated that he had heard from another employee that Aciego said that plaintiff was "old and slow." Plaintiff also referred to his complaint in January of 2010 regarding age-related remarks by Strange.

Defendant asserts that plaintiff could not have had an objectively reasonable belief that Aciego discriminated against him on the basis of age.[26] See Defendant's Memorandum (Doc. #69) at 32-33. Defendant asserts that Aciego merely discussed PPH with plaintiff, as she did with all loaders, and that plaintiff testified in his deposition that he did not recall Aciego ever making age-related comments. Id. Defendant also points to plaintiff's testimony that it was obvious to him that Bowen and Aciego were trying to get more production out of everyone, regardless of age. Id. at 32. These facts, however, do not conclusively show that plaintiff did not have an objectively reasonable belief that Aciego had discriminated against him on the basis of age. Construed in the light most

_____

[26] Defendant does not challenge whether plaintiff subjectively believed that he was a victim of age discrimination.

favorable to plaintiff, the record suggests otherwise.  Plaintiff presents evidence that Aciego repeatedly singled him out because of his low PPH when other younger workers also had low PPH numbers.  Based on this assertion, a reasonable fact finder could conclude that plaintiff reasonably believed that Aciego treated him differently because of age.

Defendant asserts that plaintiff cannot establish the second element of a prima facie case, i.e. that he suffered materially adverse action.  For purposes of retaliation, an adverse action is not limited to discriminatory acts which affect the terms and conditions of employment.  See Burlington N., 548  U.S. at 64.  To establish adverse action in the retaliation context, plaintiff must show that a reasonable employee would have found the challenged action materially adverse, i.e. that it would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Id. at 68.

The day after plaintiff complained of discrimination, Bowen subjected him to an OJS audit of his work.  When plaintiff questioned the audit, Bowen fired him for insubordination.  The next day, Bowen reduced the termination to a suspension and imposed an three-day OJS audit to determine a quota for him.  No other loader has been subjected to that type of audit or received a quota number.  Construing these facts in the light most favorable to plaintiff, a fact finder could reasonably conclude that the termination, suspension and OJS audit were materially adverse in that they would dissuade a reasonable worker from complaining of discrimination.

About two and a half months later, on December 6, 2010, Bowen transferred plaintiff to the pink belt to separate him from Aciego.  As discussed, the record supports an inference that on the pink belt, plaintiff had less opportunity to work overtime and lost the ability to work as a pickoff.  Construing these facts in the light most favorable to plaintiff, a fact finder could reasonably conclude that plaintiff's transfer to the pink belt was materially adverse in that it would dissuade a reasonable

worker from complaining of discrimination.

Defendant asserts that plaintiff cannot establish the third element of a prima facie case, i.e. that a causal connection existed between the protected activity and the materially adverse action. Where adverse action is very closely connected in time to protected activity, temporal proximity alone is sufficient to show causation. See Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004). Otherwise, if the adverse action is not closely connected in time, plaintiff must rely on additional evidence to establish causation. Id. With respect to the termination, suspension and OJS audit in September of 2010, the adverse action occurred within a matter of days after plaintiff complained of discrimination. This temporal proximity, standing alone, is sufficient to establish a causal connection. See, e.g., Ramirez v. Okla. Dep't of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994) (six-week period may be sufficient to show causation), overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186 (10th Cir. 1998).

With respect to the transfer to the pink belt (December 6, 2010), the adverse action occurred about a week less than three months from the time that plaintiff complained of discrimination (September 14, 2010). It is less clear whether this temporal proximity, standing alone, is sufficient to show causation. See, e.g., Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (assuming two-month and one-week period sufficient to show causation); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month period standing alone insufficient to show causation); Conner v. Schnuck Mkts, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month gap standing alone insufficient to show causation). Here, however, plaintiff has additional evidence which supports a finding of causation. In particular, plaintiff has produced evidence which demonstrates weaknesses in defendant's proffered reason for the transfer. Although this type of

evidence is typically considered during the third phase of the McDonnell Douglas inquiry, the Tenth Circuit has considered evidence of pretext in the prima facie stage of a retaliation claim. See Proctor v. UPS, 502 F.3d 1200, 1209 (10th Cir. 2007); Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1218 (10th Cir. 2003). As discussed, construed in the light most favorable to plaintiff, the facts support an inference that defendant's stated reason for the transfer is false. On this record, a fact finder could reasonably conclude that a causal connection existed between plaintiff's complaint of age discrimination and his transfer to the pink belt. Thus, defendant is not entitled to summary judgment on grounds that plaintiff cannot establish a prima facie case of retaliation.

Defendant asserts that plaintiff cannot show that the stated reasons for its actions are pretextual. Regarding the termination/suspension in September of 2010, defendant states that it suspended plaintiff for insubordination, including the use of profanity. See Defendant's Memorandum (Doc. #69) at 36. Plaintiff, however, presents evidence that other employees used profanity without consequence. Construed in the light most favorable to plaintiff, the record supports an inference that defendant's stated reason for the conduct is pretextual. Therefore, defendant is not entitled to summary judgment on plaintiff's claim of retaliation based on the termination/suspension of plaintiff's employment in September of 2010.

Regarding the OJS audit in September of 2010, defendant does not articulate a reason for its action.[27] On this record, defendant is not entitled to summary judgment on plaintiff's claim of retaliation based on the OJS audit.

---

[27]     Twice in its memorandum in support of summary judgment, defendant asserts that plaintiff cannot show that its stated reasons for monitoring his work are pretextual. See Defendant's Memorandum (Doc. #69) at 29-30, 34-35. Defendant, however, does not articulate it stated reasons for the action. See id.

Regarding the transfer to the pink belt, as discussed, plaintiff presents evidence which suggests that defendant's stated reason for the action is pretextual. Accordingly, defendant is not entitled to summary judgment on plaintiff's claim of retaliation based on the transfer to the pink belt.

**IT IS THEREFORE ORDERED** that Defendant United Parcel Service, Inc.'s Motion For Summary Judgment (Doc. #68) filed March 26, 2013 be and hereby is **SUSTAINED in part**. Defendant is entitled to summary judgment on plaintiff's claims of age discrimination based on the (1) the termination and reinstatement of his employment in October 2009; (2) the termination/suspension of his employment in September of 2010; and (3) the three-day OJS audit in September of 2010. Defendant's motion is otherwise overruled. The following claims remain in the case: (1) plaintiff's age discrimination claim based on his transfer to the pink belt in December of 2010; (2) plaintiff's retaliation claim based on the termination/suspension of his employment in September of 2010; (3) plaintiff's retaliation claim based on the three-day OJS audit in September of 2010; and (4) plaintiff's retaliation claim based on his transfer to the pink belt in December of 2010.

**IT IS FURTHER ORDERED** that pursuant to the Court's order (Doc. #87) of December 19, 2013, on or before **noon on Thursday, December 26, 2013**, the parties shall inform the Court whether they believe that mediation would be futile.

Dated this 23rd day of December, 2013 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge